# CHARLESTON.

EDWARD GARRETT *et al.* *v.* BOARD OF EDUCATION OF CHAPMANSVILLE DISTRICT *et al.*

(No. C. C. 442)

Submitted November 12, 1930.   Decided November 25, 1930.

*C. C. Chambers* and *Koontz, Hurlbutt & Revercomb*, for plaintiffs.

*Jas. E. Greever, L. P. Hager*, and *C. S. Minter*, for defendants.

HATCHER, JUDGE:

The plaintiffs in this case are Edward and Nora Garrett, with whom join others designated in the bill as citizens, taxpayers and patrons of Barker School No. 9, in Chapmansville District, Logan County. They seek to enjoin the Board of Education of that district and its assigns from drilling for oil and gas on the school house lot. The circuit court sustained the demurrer to the bill, as amended, and certified the questions arising upon the sufficiency thereof to this Court for its decision.

The amended bill alleges as follows: that Edward and Nora Garrett owned in fee simple a tract of 166 acres in the above district, near the center of which is situate the school lot (60 feet wide and 90 feet in length); that on March 1, 1928, they leased the tract for oil and gas, and at the present time there are three producing natural gas wells thereon, located in a triangular form around the school lot, each well being about 600 feet therefrom; that on August 10, *1927*, Robert L. Barker executed a deed to the Board for this lot, limiting the use of the property to "educational purposes only" as would appear from a certified copy of the deed filed with the bill, marked "Exhibit B"; that Robert L. Barker had no title to the school house lot as would appear from a certified copy of a deed from Floyd S. Barker and wife to Dorcas Barker filed as "Exhibit C"; that on April 1, 1930, the Board leased the lot for the purpose of drilling and operating wells for gas, oil, and water, etc., to M. C. Jennings, Trustee, and that Ara-

gon Natural Gas Company, as assignee of Jennings, is now preparing to drill the lot; that plaintiffs are advised that the lease of the school lot is void "as having been executed without authority of law"; that if a well is drilled on the lot, it would take and drain natural gas from the property of the Garretts; that the only way which they could protect themselves against such drainage would be to put down "innumerable wells all around" the lot, the cost of which would be prohibitive; that there has been erected on the lot by the Board a frame school building, 38 feet wide and 42 feet in length, costing approximately $5,000.00; that the drilling of a well on the lot would invite "the destruction of the school building  *  *  *  would unjustly endanger the lives of the pupils  *  *  *  would unduly and unnecessarily annoy the teachers and pupils and certainly result in detracting the minds of the pupils and teachers from their school work and would inevitably result in greatly decreased efficiency in the operation and accomplishment of the school"; and that the lot "might be filled with greasy and unsightly structures rendering it unsightly and useless for the children as a playground and exposing them to strangers and destroying privacy."

Looking to Exhibit "B" with the bill, as we may, we find that the deed for the school lot was made in *1897* (instead of 1927); and contains the following granting clause: "Witnesseth, that for and in consideration of the sum of Fifteen Dollars paid in hand, the receipt whereof is hereby acknowledged, the said parties of the first part do grant unto the party of the second part *for Educational purposes* with covenants of general warranty the following described property." (Italics ours.)

Three separate briefs are filed on behalf of plaintiffs, presenting different theories for construing the deed. One brief, yielding to the pronouncement in *Phillips Gas & Oil Co.* v. *Lingenfelter*, 262 Pa. 500, 105 Atl. 888, (holding that as school directors could acquire real estate only for school purposes, a grant of land with the words "for school purposes only" conveyed an absolute estate, unaffected by those words) concedes that the words in the deed here "for educational purposes" are

surplusage. The brief refers, however, to Code, chapter 45, section 33, as effective in 1897, which provided that in case a school lot became unnecessary for school purposes, the grantor of the lot could have it reconveyed to him upon repayment of the price he received, etc., (this provision since repealed) ; and contends that the board of education did not acquire an absolute title to the lot, but a title subject to the "right of recapture" by the grantor "in case of abandonment", and that no subsequent act of the legislature could deprive him of that privilege or give the grantee authority to impair the value of that contingent right of reclamation. That statute simply preferred the grantor as a purchaser, in case of sale of a school lot. It was a courtesy which did not arise until the happening of this contingency. Such a right of option did not approach the dignity of a remainder. It was not of sufficient substance to ever undo the fee. Only in rare instances will equity charge even the tenant of a defeasible fee with waste. 27 R. C. L., subject Waste, sec. 28; 40 Cyc. (same subject), p. 514; 21 C. J., subject Estates, p. 923. Much less will equity interfere in favor of one whose interest is not of the kind which could ever defeat the fee.

Another brief contends that there was an implied provision in the deed that the grantee would not lease the lot for oil and gas, and that this implication could not be invalidated by subsequent legislation. This argument is based mainly on the decision in *Herald* v. *Board of Education*, 65 W. Va. 765. That case forbade such a lease on the ground that the board of education was entirely a statutory creation, exercising only such prerogatives as the statute conferred, and that the power of the board to lease school property for oil and gas purposes had not then been vouchsafed. (That power has since been conferred by the legislature. See Code, chapter 45, section 48.) Under that contention, a deed to a board, purporting to pass an absolute fee, would virtually convey little more than an easement. It would, in effect, reserve the minerals. If such were the case, a purchaser from the board would take the lot subject to the same restrictions as his grantor. This doctrine finds no support in the *Herald* case. That opinion expressly declares that the

board had. "the legal title in fee simple" (p. 773) and concedes to the board the statutory power of fully *disposing* of the lot "so it be in the furtherance of education."

One of the briefs contends that "practically the same question" was before us in *United Fuel Co. v. Morley Co.*, 102 W. Va. 374, and that the opinion there upholding a limitation is equally applicable here. The grant there was to a township of an acre "to be exclusively appropriated and used as a site for a schoolhouse and school." We held that under the circumstances of that case, the word "exclusively" was "a word of restriction and exclusion", otherwise the township might have appropriated the property to some use not connected with schools. The deed here is essentially different from the one there, in that it contains no plain words of restriction and is to a grantee who could take it for no purpose not connected with the school system.

One of the briefs takes the position that the words "for educational purposes" *ex vitermini* import an exclusion of the use of the lot for any purposes not essentially educational. Limitations on the use of property are not favored. 18 C. J., subject Deeds, sec. 449; 2 Devlin on Real Est. (3rd Ed.), sec. 970; 4 Thompson on Real Prop., sec. 3361. The terms establishing restraint, must be "clear and certain." 18 C. J., *supra,* sec. 448. We have been frequently reminded that "restrictive covenants are to be strictly construed against the person seeking to enforce them and all doubts must be resolved in favor of natural rights and a free use of property and against restrictions." *Neekamp* v. *Chamber of Commerce,* 99 W. Va. 388; *Cohen* v. *Securities Co.,* 96 W. Va. 676; *Cole* v. *Seamonds,* 87 W. Va. 19. See also 18 C. J., *supra,* secs. 380 and 450. Here, we have no word such as "exclusively" or phrase such as "and for no other purpose" which would support the idea of exclusion. The deed contains no provision for re-entry or for enforcing a restraint in some other way. In fact the instrument contains none of the usual indicia of a limitation whatsoever. The expression "for educational purposes" stands alone. If we bear in mind that restrictions are *not favored* and will be recognized *only when plainly expressed;* if we *strictly construe this phrase against the plaintiffs,* and *if we resolve all doubts in favor of a free use of the property and against a*

*restriction,* as the above rules of construction direct, then the conclusion is inescapable that the words "for educational purposes" are merely declaratory of the object of the parties, and do not qualify the fee. "A declaration in a grant to a corporation that land is conveyed for certain purposes does not necessarily import a limitation of the fee. It is to be construed rather as an assertion of the intended legality of the grant." *Riggs* v. *New Castle,* 229 Pa. 490. *Downen* v. *Rayburn,* 214 Ill. 342, 3 Am. & Eng. Anno. Cas. 36; 6 Thompson, *supra,* sec. 5139. See generally 8 R. C. L. 1103, 6 Am. & Eng. Ency. Law, pp. 501-2; 2 Devlin *supra,* sec. 838; *Kilgore* v. *County Court,* 80 W. Va. 283; *Keatley* v. *County Court,* 70 W. Va. 267; *Railway Co.* v. *Honaker,* 66 W. Va. 136; *Harold* v. *Board of Education, supra;* and *Carper* v. *Cook,* 39 W. Va. 346.

Say that the words in question "create a confidence or trust" as such words were held might do in the oft cited case of *Rawson* v. *Inhabitants,* 7 Allen (Mass.) 125, 130. Then we answer that the trust has not been broken. Under the statute the proceeds of the lease will go into the school fund and be used exclusively for educational purposes. It is not of consequence that the grantor did not anticipate in 1897 that the legislature would later make leases of school lands serve the purposes of education. His limited vision then, cannot be permitted to frustrate, now, an educational use which is different merely in character from the uses he foresaw. So long as a use advances the cause of education, his confidence, as expressed in the grant, is not violated.

One of the briefs inadvertently bases an argument on Acts 1919, chapter 2, section 48. This section was modified by Acts of 1921, chapter 12, which gave us the section as it now appears in Code, chapter 45, section 48. Another of the briefs further contends that since that section requires as a condition to a sale of school lands that the lands be no longer properly located or suitable for school purposes, and further requires that such lands must be sold at public auction to the highest bidder on proper legal notice, then the same conditions must appear and the same steps be taken in case of a lease. The statute supports this argument only as to the

manner of procuring a lessee. It directs that a lease of school lands for oil and gas be made "by the same method prescribed for the sale of school buildings and lands." This obviously implies that the lease be awarded at public auction, after legal notice, to the responsible person offering the most advantageous terms. As the bill makes no charge that the lot was not leased by this method, the law affords a presumption that the Board complied with the statute. *Wilson* v. *Fleming*, 89 W. Va. 553 (pt. 6, syl.).

Exhibit "C" is a deed made May 3, 1875, by Floyd S. Barker and wife to Dorcas Barker. The deed conveys 500 acres to the grantee for life, only, and provides that at her death the land shall be equally divided between three "boys", one of whom is Robert L. Barker, and that he "is to possess the home place." The bill does not show whether the 500 acre tract embraced the school lot, whether Dorcas Barker was alive in 1897, or whether the school lot was exterior to the "home place" which Robert L. was to possess. Consequently we cannot see how this exhibit demonstrates that he had no title to the lot in 1897, as the bill alleges. On the contrary, plaintiffs' Exhibit "A", which is a copy of the deed to the Garretts for the 166 acres, shows by recitals, that they hold under Robert L. Barker, who seemingly acquired complete title thereto in 1904. If so, his later acquisition inured to the benefit of the Board, his deed to it in 1897 having been made with general warranty of title. *Summerfield* v. *White*, 54 W. Va. 311; *Clark, Tr.* v. *Sayers & Lambert*, 55 W. Va. 512; *Yock* v. *Mann*, 57 W. Va. 187.

As the Garretts have three wells within 600 feet of the school lot, the allegation in the bill that "innumerable wells all around the lot" would be required to prevent drainage of the Garrett property by a well on the school lot, must be treated as exaggerative. Undoubtedly, a well on the school lot would drain gas from adjoining territory. But are not the three existing wells even now draining gas from the school lot?

In authorizing boards of education to lease school lands for oil and gas, the legislature is presumed to have taken into consideration the objections to boring and operating

wells on school property, and to have concluded that the ills to be suffered would be compensated by the advantages received. There is no charge here of bad faith. The Board as well as the legislature has acted within its jurisdiction. The discretion of either body in such case is not ordinarily subject to judicial review. *Spedden* v. *Board*, 74 W. Va. 181; *Swiger* v. *Board*, 107 W. Va. 173, 177.

The bill presenting no ground for equity jurisdiction, it is not necessary to pass on the question of multifariousness raised by defendant.

The ruling of the circuit court is affirmed.

*Affirmed.*