GARY D. ROGERS

*v.*

THE CITY OF SOUTH CHARLESTON etc., *et al.*

(No. 14437)

Decided June 28, 1979.

*Steven L. Miller, Larry G. Kopelman* for appellants.

*Hoyer, Hoyer & Berthold, Eugene R. Hoyer, Robert V. Berthold, Jr.,* for appellee.

McGraw, Justice:

This appeal requests dissolution of a permanent injunction which restrains the City of South Charleston and the Board of Park and Recreation Commissioners of the City of South Charleston from carrying out the terms of an agreement entered into between the Board of Park and Recreation Commissioners and George D. Zamias, a private individual. In the agreement the Board of Park and Recreation Commissioners granted Zamias an irrevocable and exclusive option to purchase a 120 acre tract of real estate located in Little Creek Park, a municipal recreation area. Appellants' major

contention is that the circuit court erred in ruling that the option agreement was beyond the scope of the statutory authority of the Board of Park and Recreation Commissioners. We do not agree and we affirm the holding of the circuit court on this point. Appellee Rogers cross-appeals from the lower court's finding that the Board of Park and Recreation Commissioners may sell real property without a public auction. On this point we reverse.

On April 22, 1968, the City of South Charleston acquired, in fee simple, by purchase, approximately 270 acres of undeveloped woodland adjacent to the city limits which became known as Little Creek Park. On February 15, 1973, the South Charleston City Council, pursuant to W. Va. Code § 8-21-1, created by ordinance the Board of Park and Recreation Commissioners (hereinafter referred to as the Board), a public corporate body.

On December 7, 1973, the City conveyed to the Board the 270 acres of undeveloped land acquired on April 22, 1968, subject to the condition that it be used "... solely and exclusively for public parks and recreation and the recreation system of the City of South Charleston." The deed also stated that upon dissolution of the Board the property would revert to the City. By unanimous vote, the Board, on August 11, 1976, declared that 120 acres of the 270 acre tract was surplus, and that same day executed an option to sell the 120 acres to Mr. George Zamias for the private development of a shopping mall. The option agreement was conditioned upon the approval of the City Council, the removal by City Council of the restriction requiring use of the property for park and recreational purposes and the City's release of its reversionary interest. The term of the option was for six years or for two years after the date of completion of the proposed Corridor G highway, whichever was earlier. On September 2, 1976, the Board amended the option agreement to provide that all consideration paid for the option be non-refundable. On that day, the City Council also held a public hearing upon Ordinance No. 1166,

which sought to enable the sale under the option agreement.

Ordinance No. 1166 became law on September 9, 1976. This ordinance determined, among other things, that the use and that a shopping mall constructed on the property would be of benefit to the City. The ordinance also "unconditionally released" the Board from the restriction requiring recreational use of the 120 acres and conveyed to the Board the City's reversionary interest. A formal release implementing Ordinance No. 1166 was executed by the Mayor of South Charleston on February 16, 1977.

On June 1, 1978, appellee Gary Rogers, a citizen, taxpayer, voter and real property owner of the City of South Charleston, commenced this action for injunctive relief. He claimed that the option agreement was void as exceeding the statutory authority of the Board and as restraining future Boards from exercising their authority over park lands, that any sale of Board property must be had by public auction, and that the consideration agreed to by the Board in the option was grossly inadequate.

The Circuit Court of Kanawha County found that the option agreement executed by the Board and the ordinance passed by city council purporting to implement it were void and entered a permanent injunction restraining the City and the Board from exercising the terms of the option agreement. It is from this decision that the City and the Board appeal. The appellee cross-appeals from the finding of the lower court that the Board was not required to sell the property in question at public auction.

## I.

Appellants contend that the lower court erred in finding that the Board was not authorized to execute an option agreement entitling a private individual to purchase the park land as much as six years in the future. They point to W. Va. Code § 8-21-2, vesting the Board

with authority to purchase, hold and sell real property, and say that it is clear that the Board has been granted the power to contract and to be contracted with to the same extent as a private corporation, including the power to execute an option to purchase real property.[1] We do not see the merit in these arguments.

The Board is not unlimited in its power to contract or to convey real property. The authority of the Board to purchase or to hold property is granted only for the purpose of ". . . establishing, constructing, improving, extending, developing, maintaining and operating a city public park and recreation system."[2] Clearly, the Board may not enter into contracts or purchase or hold land for any other purpose.

Furthermore, parks are for the benefit of, and are held in trust by the Board for, the municipality and the public. 10 McQuillan, *Municipal Corporations* § 28.52 (3d ed. 1966); *Quinn v. Dougherty*, 30 F.2d 749 (D.C. Cir. 1929); *Paepcke v. Public Building Commission*, 46 Ill.2d 330, 263 N.E.2d 11 (1970); *Gallagher v. Omaha*, 189 Neb. 598, 204 N.W.2d 157 (1973). The Board may hold the title to such lands but it holds the property for the municipality and the usufruct is in the public. *Board of Park Comm'rs v. Shanklin*, 304 Ky. 43, 199 S.W.2d 721 (1947). Thus the Board's power is also limited to contracts and

---

[1] W. Va. Code § 8-21-2 provides:

The board of park and recreation commissioners provided for by charter provision, or created by ordinance, pursuant to the authority of this article, shall be a public corporate body, with perpetual existence and a common seal. It shall be known as the board of park and recreation commissioners of such city. It shall have the power to purchase, hold, sell and convey real or personal property; receive any gift, grant, donation, bequest of devise; sue and be sued; contract and be contracted with; and do any and all things and acts which may be necessary, appropriate, convenient or incidental to carry out and effectuate the purposes and provisions of this article . . .

[2] W. Va. Code § 8-21-1. *See also* W. Va. Code §§ 8-21-2, 8-21-7 through 9.

conveyances that are in the best interests of the public and the municipality.

Finally, by its very nature as a public corporate body, the Board is limited in regard to its power to contract and convey property. It is well settled that a public corporation created by statute is vested only with such powers and authority as are expressly given by the Legislature or as fairly arise by necessary implication from the express statutory grant or as are requisite to enable the corporation to carry out the function. *Evans v. Hutchinson*, ____ W. Va. ____, 214 S.E.2d 453 (1975) (board of education); *Mohr v. County Court*, 145 W. Va. 377, 115 S.E.2d 806 (1960) (county court); *Law v. Phillips*, 136 W. Va. 761, 68 S.E.2d 452, 33 A.L.R.2d 95 (1952) (municipal corporations); *Dooley v. Board of Education*, 80 W. Va. 648, 93 S.E. 766 (1917) (board of education). W. Va. Code § 8-1-7 relaxes the common law rule of strict construction somewhat but it does not lift all restrictions on the exercise of power by the Board.[3]

Appellants, however, point out that the statute vests the Board with the power to perform "* * * any and all things and acts which may be necessary, appropriate, convenient or incidental to carry out and effectuate the purposes and provisions of this article. . . ."[4] They maintain that this provision alone enables the Board to act to the same extent as a private corporation. We do not agree. The Board may be authorized to exercise such powers, but it may do so only within the scope of the aforementioned limitations. Nothing in the statute indicates an intent of the part of Legislature to free the Board from these general limitations placed on all similar public corporate bodies and differentiating them from private corporations.

---

[3]W. Va. Code § 8-1-7. ". . . The enumeration of powers and authority granted in this chapter shall not operate to exclude the exercise of other powers and authority *fairly incidental thereto or reasonably implied and within the purposes of this chapter. . . .*" (emphasis added).

[4]W. Va. Code § 8-21-2.

Plainly, the Board does not have the power to contract or to convey property to the same extent as a private corporation. The Board's power is limited by its statutory purpose and by its character as a public corporation and a trustee. And since any contract entered into by a public corporate body which is beyond the scope of its statutory powers is void,[5] it is necessary to determine if the limited statutory grant of general powers confers upon the Board the power to execute an option agreement.

Here there is no express grant of power to the Board to enter into option agreements. The Board is given the power to "sell or convey" its real property, but several cases have held that a statutory grant of authority to a public body to sell, convey or dispose of property does not include the authority to give a private corporation or individual an exclusive option to purchase public lands in the future. *Whitworth College v. Brookhaven*, 161 F. Supp. 775 (S.D. Miss. 1958), *aff'd* 261 F.2d 868 (5th Cir. 1958); *Johnson v. City of Sylacauga*, 293 Ala. 429, 304 So.2d 586 (1974); *City of Tuskagee v. Sharpe*, 292 Ala. 14, 288 So.2d 122 (1974); *Potter v. C. C. Slaughter Cattle Co.*, 254 S.W. 775 (Tex. Com. App. 1923); *C. C. Slaughter Cattle Co. v. Potter County*, 235 S.W. 295 (Tex. Civ. App. 1921).[6]

Appellants attempt to avoid this authority by analogizing the position and powers of the Board to those of a municipal corporation. They cite *Wheeling Gas Co. v. Wheeling*, 8 W. Va. 320 (1875) as standing for the proposition that West Virginia permits cities to enter agreements granting the city an option to purchase property

---

[5]10 McQuillan *Municipal Corporations* § 29.10 (3d ed. 1966); *City of Bristol v. Dominion Nat. Bank*, 153 Va. 71, 149 S.E. 632 (1929).

[6]An option is neither a sale nor an agreement to sell. It is not an exercise of the power to sell, but a surrender of it for the time stated in the agreement. *City of Tuskagee v. Sharpe*, 292 Ala 14, 288 So.2d 122 (1974), *citing Adler v. Adler*, 216 Ga. 553, 118 S.E.2d 456 (1961); *Moore v. Trainer*, 252 Pa. 367, 97 A. 462 (1916); *C. C. Slaughter Cattle Co. v. Potter County*, 235 S.W. 295 (Tex. Civ. App. 1921); *Tibbs v. Zirkle*, 55 W. Va. 49, 46 S.E. 701, 104 Am. St. Rep. 977, 2 Ann. Cas. 421 (1904).

from a private corporation and they argue that this is no different from the situation at hand. The *Wheeling* case, however, involved an express statutory grant of authority to the city to take an option to purchase private property.

Furthermore, a city *holding* an option to purchase property is in quite a different position than a city *granting* an option to purchase property. In the former situation the city is in no way bound to purchase the property. A succeeding city council will still be vested with the ability to decide whether it wishes to purchase the property, given the circumstances and a determination of the best interests of the public at that time. The terms of the latter agreement commit the city absolutely to sell the property to the optionee once he has decided to purchase it. Succeeding governing bodies are deprived of the discretion conferred upon them by statute to determine if the sale will benefit the public and are bound by the actions of a past body, taken perhaps when circumstances were different.[7]

In the case before us, the Board members generally serve staggered six year terms.[8] Consequently, it is quite possible that at the time the developer exercises his option, a succeeding Board, composed of different members, would be less than unanimous in approving the sale of the property as required by statute.[9] The effect of permitting the Board or the developer to enforce the option by agreement would be to force a succeeding Board to sell property contrary to statutory mandate and to preclude the Board from determining whether the terms of the agreement are beneficial to the public at the time of the sale.

---

[7]For example, there is no consideration given to the possibility that the market value could increase over the term of the option, the fact that changing conditions could make the property more valuable for public purposes, the possibility that a better offer would be made or the possibility that the body would not be unanimous in approving the conveyance at the time of the sale.

[8]W. Va. Code § 8-21-3.

[9]W. Va. Code § 8-21-9.

Other courts have held that it is beyond the power of the governing body of a municipality to tie the hands of future governing bodies in exercising the full jurisdiction of their office by depriving them of a discretion which public policy demands remain unimpaired. *Whitworth College v. City of Brookhaven*, 161 F. Supp. 775 (S.D. Miss. 1958), *citing Tullos v. Town of Magee*, 181 Miss. 288, 179 So. 557 (1938); *Edwards Hotel & City Street Railroad Co. v. City of Jackson*, 96 Miss. 547, 51 So. 802 (1910); *Plant Food Co. v. City of Charlotte*, 214 N.C. 518, 199 S.E. 712 (1938).

It is well established that a private trustee holding the power to sell and to lease property generally does not have the power to give an option to purchase, the purpose of the rule being to compel the trustee to exercise his judgment at the time of the sale and not at the time of making the option as to whether the sale is beneficial to the trust estate. *Adler v. Adler*, 216 Ga. 553, 118 S.E.2d 456 (1961); *Moore v. Trainer*, 252 Pa. 367, 97 A. 462 (1916); *Tibbs v. Zirkle*, 55 W. Va. 49, 46 S.E. 701 (1904). If such a duty is imposed upon municipalities and upon trustees in private transactions, we can see no reason why it should not be required of a public corporate body such as the Board acting as a trustee for the general public. Only an express statutory grant of authority can relieve the Board of this duty and we find none in the statute at hand.

For these reasons we hold that a Board of Park and Recreation Commissioners exceeds it statutory authority by giving a private or special interest exclusive, irrevocable rights to purchase in the future real property held for park and recreation purposes and such an option agreement is therefore void.

Appellants also contend that the lower court erred in finding that injunctive relief was not barred by laches, that appellee had standing to sue and that the actions of the City were not completed and therefore enjoinable. We find no error in the lower court's ruling on these matters and affirm. We deny appellant's motion to dis-

miss the cross-appeal for failure to comply with the rules of this Court, there being no prejudicial irregularity.

Appellants' final contention is that the lower court erred in declaring void the conveyance to the Board by Ordinance 1166 of the City's reversionary interest. While we note that the circuit court may have erred in finding the use restriction gave rise to a possibility of reverter and a right of re-entry on the part of the City, we do not agree that the lower court erred in holding the City's conveyance of its reversionary interest void.[10] As has

---

[10]The circuit court found that the use restriction contained in the deed of December, 1973, conveying the Little Creek Park property to the Board ". . . solely and exclusively for public parks and recreation and the recreation system of the City of South Charleston . . .", when coupled with the belief and intentions of the City and the Board in contracting the release of the restriction gave the Board "an interest subject to recapture upon a breach of the conditions of use." We note, however, that it is almost uniformly held that

"[c]onditions in conveyances which have the effect of forfeiting the title vested in the grantee are looked upon with disfavor by the courts, and unless the language used clearly imparts the intention of the parties that the title should revest upon non-compliance with the condition, the deed will not be held to be a deed upon condition subsequent." *Killgore v. Cabell County Court*, 80 W. Va. 283 at 286, 92 S.E. 562 at 563 (1917).

Generally a condition subsequent vesting the grantor with a right to retake the grantee's property is found only where the deed contains express language to that effect and it is very rare for a court fo find such an interest by implication. *Garret v. Board of Education*, 109 W. Va. 714, 156 S.E. 115 (1930); *Killgore v. Cabell County Court*, 80 W. Va. 283, 92 S.E. 562 (1917). We cannot say that the deed did not plainly express the intention of the parties to create in the City a right to recapture the property upon non-compliance with the use restriction, since the deed was not made a part of the record and we are presented only with the language of the restriction. In any case, the resolution of this question is superfluous in view of the fact that the deed expressly provided for reversion to the City of the property in question should the Board be dissolved and that the City also purported to convey this interest to the Board by Ordinance 1166. It is upon this attempted conveyance that we base our holding.

already been noted, the Board may acquire and hold property only for park purposes. In addition, the City may convey property to the Board only for such purposes.[11] Regardless of what interests in the park property the city attempted to convey on September 9, 1976 by Ordinance 1166, it is clear that the purpose of the conveyance was not to vest the Board with a property interest to be used for park purposes, but rather to aid the Board in transferring in fee simple to a private interest, property already declared by the Board to be unfit for park purposes. Since the purpose of conveying the reversionary interest was beyond the statutory authority vested in either the City or the Board, the conveyance is void.

## II.

In his cross-appeal, appellee Rogers asserts that the trial court was in error in finding that the Board was probably empowered to sell property without a public auction. W. Va. Code § 8-12-18(b) provides that sales of property by a municipality must be at public auction with adequate notice to the public.[12] The statute authorizing the Board to sell or convey property is silent as to the manner of sale. Appellee argues that the Board, as an adjunct of the City is required to sell property in the same manner as a municipality. Appellant argues that the Board is an independent body authorized to sell property in its own right and is not subject to the restrictions on municipalities. It is necessary therefore to look at the relationship of the Board to the City to determine if the statutory requirement imposed on a

---

[11]W. Va. Code § 8-21-9 provides that "... [t]he city and all other public bodies owning real property intended to be used for public parks and recreation are hereby authorized to convey the same to said board to be held by it *for such purposes* ..." (emphasis added)

[12]Transfers of municipal property exempted from this requirement include the sale or lease of public utilities, transfers of property to other public bodies and political subdivisions of the State and transfers to the United States or its agents or instrumentalities. W. Va. Code § 8-12-18(a).

municipality to sell property at public auction applies to property sold by the Board.

The Legislature has granted local governing bodies the general power to establish and maintain public parks and recreational facilities.[13] The Legislature has also granted the authority to the municipalities to create a Board of Parks and Recreation Commissioners in order that the municipalities can enhance their ability to provide parks.[14] By delegating to the Board the municipal park function, the municipality provides a body that will turn its full attention to establishing, improving and maintaining parks and recreational facilities.

The law anticipates that the Board will be comprised of members with special concern and an interest in developing expertise in the development and management of parks. It is anticipated that this will result in a higher quality park system for the public, the people of the municipality. While the Board, as the appellants contend, is an independent corporate body, by statute the sole purpose for its creation and function is to fulfill a local government function for which the municipality is empowered, *i.e.* ". . . [t]o establish, construct, acquire, provide, equip, maintain, and operate recreational parks, playgrounds, and other recreational facilities for public use . . ."[15]

The Board of Parks and Recreation Commissioners could not exist in the absence of the local government which it complements. It is important to note that except for gifts and donations[16] the Board's financing is ultimately under the control of the governing body of the municipality. Although the Board may charge for the use of facilities under its control and may use these funds for the purpose of establishing, improving and

---

[13] W. Va. Code §§ 8-12-5(37), 10-2-2.

[14] W. Va. Code § 8-21-1.

[15] W. Va. Code § 8-12-5(37).

[16] W. Va. Code § 8-21-12.

maintaining the park system,[17] the Board has no power, independent of the municipality, to levy taxes or to issue revenue bonds for the operation or development of public parks under its control. These powers are ultimately left to the municipality and to its governing body which is directly accountable to the people of the corporation.[18]

Further indicia of the intimate relationship between the Board and the City include provisions that the Board may hold property in its own name or in the City's name,[19] that the City shall provide the Board with an office in the city building from which to operate,[20] and that the city attorney shall be the official counsel for the Board.[21]

Finally, as we have already noted, the Board holds property in trust for the public and the municipality and it must use and dispose of that property for the benefit of the public and to the end of establishing, improving and maintaining the municipal park system. A city Board of Park and Recreation Commissioners is empowered to sell or convey real property acquired for municipal park and recreation purposes only upon a determination that such property is of no advantage in the establishment, construction, maintenance, development or improvement of the park system and only upon unanimous vote of the Board members.[22]

We conclude then that while the Board exists as an independent corporate body apart from the municipality, it can never escape the shadow of the City. The Board and the City stand in a symbiotic relationship, the Board being an instrument in aid of the municipality and acting in the City's behalf. In view of the close relationship between the Board and the City, we cannot permit the Board to do that which the City cannot un-

[17]W. Va. Code § 8-21-11.
[18]W. Va. Code §§ 8-21-13, 10-2-2.
[19]W. Va. Code § 8-21-9.
[20]W. Va. Code § 8-21-7.
[21]W. Va. Code § 8-21-10.
[22]W. Va. Code § 8-21-9.

less such power is expressly given the Board by statute. The statute authorizing the Board to sell or convey real property is mute as to the manner of such sale or conveyance. In the absence of express statutory authorization the Board must dispose of property at public auction in the same manner as the City.[23]

The requirement of a public auction upon proper notice of municipal property insures that the governing body will not sell property to a private or special interest in derogation of its duty to act in the best interests of the public. Such a requirement seems properly imposed upon the Board, considering its relation to the City. Without such a requirement, a board or a city council composed of unscrupulous members could avoid statutory obligations to the public by effecting private transfers of public lands without notice or public sales. We do not imply that such was the case here, but the law must always concern itself with such possibilities. We merely recognize that one of the fundamental principles of representative self-government is accountability of public officials to the citizens in whose behalf they act. A mechanism for direct accountability is not provided by the statute authorizing the creation of the Board and the Board must therefore operate under strict restraints.

Consequently we hold that in the absence of express statutory authorization regarding the manner of sale, a city Board of Park and Recreation Commissioners, a public corporation, walks in the shadow of the City and any sale or conveyance of such property to a private or special interest must be accomplished by means of a public auction held upon proper notice as provided in W. Va. Code § 8-12-18(b).

---

[23]We note that the imposition of the public auction here does not affect the ability of the Board to convey property to other governmental bodies without public auction and upon a negotiated price. *See* W. Va. Code §§ 1-5-3, 8-12-18, 8-21-9.

Another issue appellee raises in his cross-appeal is whether the sale price specified in the option agreement is grossly inadequate. The present record contains insufficient evidence to enable us to make a determination on this point. If, however, the Board follows the proper procedure for selling real property as outlined above, the public auction upon proper notice to the public should result in a fair and adequate price for the land and should render the question moot.

Finally, we note that appellee in his reply brief alleges that the appellant City has since sold by quit-claim deed at public auction its reversionary interest. While the record does not support his contention since this case was pending appeal at the time of the alleged sale, we would observe that if this allegation is true, such a sale would fail.

The purpose behind the public auction requirement is to insure that all prospective purchasers of the property stand an equal footing one to the other and to maximize the purchase price of the property for the benefit of the City by awarding the property to the responsible bidder offering the most advantageous price.[24] A public auction also permits a prospective purchaser to visualize the uses to which the property may be put and to bid accordingly. Here the City and the Board have so maneuvered and manipulated their interests in the property that at the time of the alleged auction a cloud existed upon the title to the property. The Board's authority to give a valid option to a private interest was in litigation. Certainly the City could anticipate that this state of affairs would have a chilling effect on any bidding at public auction. As a consequence the underlying purpose of the public auction would be defeated.

For the reasons stated above, we affirm the holding of the circuit court that the execution of the option agree-

[24]*Garrett v. Board of Education*, 109 W. Va. 714, 156 S.E. 115 (1930).

ment by the Board of Park and Recreation Commissioners was beyond its statutory authority and therefore void, and we reverse the lower court's finding that the Board need not sell property at public auction. Remanded for further proceedings in accordance with this opinion.

*Affirmed in part;*
*reversed in part.*

NEELY, JUSTICE, *dissenting:*

I respectfully dissent from the majority's opinion on the grounds that the statute, *W. Va. Code*, 8-21-2 [1969] specifically grants to a board of park and recreation commissioners the power to "purchase, hold, sell and convey real or personal property; receive any gift, grant, donation, bequest or devise; sue and be sued; contract and be contracted with; and do any and all things and acts which may be necessary ... to carry out ... this article." Since there is no express limitation on the right to convey property, nor any express requirement in the statute or elsewhere which mandates sale at public auction, none should be imposed by this Court.

Unless it appears that the duly constituted political authorities failed to act in the fiduciary interests of the citizens of the city and that there has been fraud, collusion, malfeasance, or the exercise of such outrageous business judgment that it is shocking to any reasonable mind, the decisions on matters of this kind of elected city officials should not be disturbed when there is no clear statutory provision which has been violated. Under the guise of procedural law a court should not substitute its judgment of the merits of a public issue for that of other duly constituted agencies of government acting in good faith pursuant to their own statutory mandates. *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council*, 435 U.S. 519, (1978). This is what I believe has occurred in this case.

At the outset it should be pointed out that this case, on its facts, is not about a cozy deal between corrupt city officials and an avaricious entrepreneur, but rather about a thoughtful, publicly disclosed, project for joint economic and recreational development. The record clearly demonstrates that the consideration for the option and the purchase price for the land in question were both fair.

Since this is a case of first impression and we are asked to interpret a vague statutory scheme, the facts are important. On 22 April 1968 the city of South Charleston acquired approximately 270 acres of undeveloped woodland adjacent to the city limits. The purchase was made from the city's general revenue fund, and no individual property owner was assessed in connection with the purchase. On 15 February 1973 the South Charleston Board of Parks and Recreation, an independent public corporation, was formed by Ordinance #1104 and on 7 December 1973 the City of South Charleston transferred to its Board of Parks and Recreation, without consideration, the 270 acres of woodland subject to the condition that it be used for park and recreational purposes. It is a portion of this tract which is the subject of the instant law suit. On 11 August 1976 the South Charleston Board of Parks and Recreation, by unanimous vote of the Commissioners, declared 120 acres of the original 270 acre tract to be surplus and executed an option agreeing to sell that 120 acres, conditioned upon approval of the option by the City Council and removal by the City Council of the restriction requiring that the property be used for recreational purposes. On 2 September 1976 the South Charleston Board of Parks and Recreation amended the option to provide that all consideration paid for the option be non-refundable and on the same day the South Charleston City Council held its first *public* hearing upon Ordinance #1166 which would release the restriction upon the 120 acres in question. On 9 September 1976 the City Council held its second *public* hearing upon Ordinance #1166 and on 16 February 1977 Ordinance #1166 was implemented by removing

the restrictions upon the 120 acres of optioned property. Throughout every stage of the negotiations the question was publicly debated, both formally and informally.

Ordinance #1166 specifically found that the 120 acres were undeveloped and *incapable* of development for recreational use due to lack of access. The ordinance further found that the development of the 120 acres by the construction of a shopping mall would provide the city with necessary access between Corridor G and the remaining 150 acres of undeveloped woodland retained by the Board, and that if the option were exercised the sale would provide $360,000 for development of the remaining 150 acres as a park. Furthermore, the ordinance concluded that the exercise of the option would provide a major business center for Kanawha County and create employment for the citizens of the City of South Charleston with attendant tax revenue for both the City and the State.

I

*W. Va. Code,* 8-21-9 [1969] concerning the authority of the park boards provides that :

> The board shall have the right to sell and convey only such part of the real property that it may acquire by gift, devise, purchase or otherwise, as it may determine to be of no advantage in the establishment, construction, improvement, extension, development, maintenance of operation of said public parks, parkways, playgrounds, athletic fields, stadiums, swimming pools, skating rinks or arenas and other public park and recreational facilities, whether of a like or different nature; except that the board shall have the power and authority to make such sales and conveyances of its real property as may be necessary, appropriate or convenient to enable the city to obtain the benefits of article sixteen of this chapter or any other similar act or legislative authorization. Under no circumstances shall any of such real property of the board be sold or

conveyed except by unanimous vote of all of the members of said board.

Although this section of the *Code* does not specifically provide for private sale, such power is not withheld, and we should reasonably infer that the provision that the sale must be by unanimous consent of the commissioners is a deliberate substitute for the safeguards accompanying a public auction.

This case presents the use of the legal process to frustrate legitimate economic development by raising the spectre that all private negotiations between governmental bodies and individual entrepreneurs will necessarily result in large private profits to the detriment of the public welfare. Obviously the risk of this happening should not be taken lightly, but the approach taken by the majority is to employ a cudgel when a rapier is needed; instead of confronting the problem of potential graft and corruption directly, the majority have been content to chill all local initiative and creativity regardless of whether the public will be served.

When we look at the transaction under consideration what we see is a private developer who is interested in building a multi-million dollar shopping mall on a piece of useless ground. Furthermore, the record conclusively demonstrates that the City of South Charleston did not have *and does not have* adequate funds to develop the raw lands currently in its possession for park and recreational purposes without a large infusion of outside money. Consequently, in order to serve the interests of the public in two areas, *i.e.*, (1) the development of a park, and (2) the provision of jobs and tax revenues, it was thought expedient to enter into partnership with a private developer. All negotiations were conducted under public supervision; public hearings were provided on the issue of whether the city should release restrictions; and there was unanimous approval by the Park Board and majority approval by the City Council. Unless this Court were to be consummately cynical about the nature of the political process, we should infer that a valid

political decision has been made in the best interests of the public.

In order to create a multi-million dollar mall it is necessary to coordinate the efforts of surveyors, engineers, architects, lending institutions, large chain stores to provide the "anchor" for the project to attract smaller stores, and finally contractors. This process frequently require years of effort and expense. A private developer is never sure that a proposed project will work out until all the pieces come together; therefore, a developer cannot pay top dollar for land until he sees if the other pieces of the puzzle fit, so he *must* take an option. Certainly this business reality should bring the granting of an option within the meaning of the words "contract and be contracted with" of *Code*, 8-21-2 [1969] when read together with *Code*, 8-21-9 [1969] giving the Board power to "sell and convey ... property ... as it may determine to be of no advantage ..."

## II

There is no question in my mind that the statutory scheme[1] establishing a board of park and recreation commissioners as an adjunct of a city provides so many lacunae in its express terms that the statutes are subject to almost any interpretation. My complaint with the majority opinion is not that the majority's interpretation of vague language is totally frivolous or unjustified, but rather that it bespeaks a certain indifference to the economic needs of West Virginia, a certain ignorance of basic business practices, and a callous disregard of an urgent public policy to create employment. Under the majority's holding today it is now impossible for a park board to enter into an option agreement with a private developer for the purpose of developing surplus land. Without an option no developer save one with enormous surplus capital to inventory land can afford to do the research and development necessary to determine

---

[1]*W. Va. Code*, §§ 8-21-1–8-21-14 [1969].

whether a project is feasible. The consideration for the granting of the option is that where a commercial project is feasible, the developer will pay far in excess of the normal fair market value of the land because of its peculiar value *to him* as a developer, based upon exhaustive research. The fair market value of land is always determined by what a willing seller would accept and a willing buyer would pay for the ordinary use of property; *Wheeling Elec Co. v. Gist*, 154 W. Va. 69, 77, 173 S.E.2d 336, 341 (1970); *see also, State Road Com'n v. Board of Parks Com'rs.*, 154 W. Va. 159, 167, 173 S.E.2d 919, 925 (1970); however, an option price is predicated upon a *special* use for the property and, in general, once all of the elements of a business deal are capable of being closed, particular property under option takes on a substantially enhanced value attributable to its special use. On the facts of the case before us I doubt that the property in question would sell at *auction* for the price set forth in the *option*.

The suspicion of today's courts regarding all business transactions is slowly developing a legal structure which provides disincentive both to private initiative and to cooperation between the government and private enterprise. It is very nice to have acres upon acres of beautiful, unspoiled land available for scenic and recreational purposes; however, the nations of Upper Volta, Paraguay, and Haiti have unspoiled land in abundance while the people are starving. Communities must make political choices between natural beauty and steady work.

The common law has always been imaginative in devising remedies to suppress actual fraud (the examples of resulting trusts and implied trusts leap instantly to mind) and if what we are concerned with in fleshing out the Legislature's statutory scheme for park boards is the possibility of fraud or political manipulation, then we should address these issues directly and not by the proliferation of complex procedure which is successful in eliminating abuses only because it eliminates all activity of any sort whatsoever.

## III

The common law has also been imaginative in deciding when municipal corporations may enter into contracts that bind their successors. If a contract appears reasonable to a court it is considered to be within the"proprietary" powers of the governing body, but if the contract appears eminently unreasonable it is deemed void because it is within the "governmental" powers of the governing body. These concepts are indeed empty vessels into which the courts must pour meaning since the line between powers classified as governmental and those classified as proprietary is blurred at best. The court in *Plant Food Co. v. City of Charlotte*, 214 N.C. 518, 199 S.E. 712 (1938) rejected that obvious sleight of hand and, instead, the court concocted a test which was equally as vapid as the governmental-proprietary test. Their new test, which was adopted in our majority opinion, required that contracts be prohibited where public officials are deprived of a "discretion which public policy demands should be left unimpaired." *Id.* at 214 N.C. 520, 199 S.E. at 714. The majority cited *Plant Food* for the proposition that governing bodies may not bind their successors by contract, but that court actually held the converse, namely that there was no governmental discretionary power of the city that was compromised in the making of a contract in which the city agreed to sell sludge to a plant food company over a ten year period.

An analysis of the "other courts" cited by the majority for the proposition that a governing body may not bind its successor by contract if it impairs a discretion which public policy demands should remain unfettered demonstrates that the true test is whether the contract itself is reasonable. A close examination of the three other authorities relied on by the majority in addition to *Plant Food, supra* reveals that in each case the governing bodies that entered into contracts had *horrendous business judgment*. The court in *Whitworth College v. City of Brookhaven*, 161 F.Supp. 775 (S.D.Miss. 1958) voided a contract which granted a private college a forty year lease for $1 a year with an option to purchase after

twenty years for $25,000 plus 4% interest at any time in the succeeding twenty years. The contract in *Tullos v. Town of Magee*, 181 Miss. 288, 179 So. 557 (1938), which was cited in *Whitworth* and in the majority opinion for the same proposition, was even more unreasonable in that it called for monthly payments to the operator of a town water pump for the rest of his life with a right of succession in his lineal heirs "provided they could show by actual work that they were qualified and capable [enough to operate a water pump.]" *Id.* at 294, 179 So. at 558. The final authority cited by the majority, *Edwards Hotel & City R. Co. v. City of Jackson*, 96 Miss. 547, 51 So. 802 (1910), is the father of this line of cases and the most unreasonable of the lot. In this instance, the city board entered into a contract with a street railway company which relieved the railway company of any duty to pay for the paving of the streets leaving the property owners along the streets with the burden of subsidizing the cost of the streetcars.

Judging from the obviously ill-advised contracts that the governing bodies entered into in the cases cited in the majority opinion, it appears that justices would be blind if they failed to detect the real principle lurking behind these decisions. These cases show that at best governing bodies sometimes are suckers and at worst they are crooked. Thus, the rule has evolved that a contract which extends beyond the terms of the governing body is binding so long as "at the time of execution, it is apparently fair, just and reasonable and is prompted by the necessities of the situation or its nature is advantageous to the municipality." 63 C.J.S. *Municipal Corporations*, § 987 (1950). Although I seldom cite the Janus faced *Corpus Juris*, on this occasion it has actually made some sense out of a large body of judicial nonsense and owing to the paucity of authority in this area it is the only source where the correct rule is concisely stated. *See also Denio v. City of Huntington Beach*, 22 Cal.2d 580, 590, 140 P.2d 392, 397 (1943). Turning again to *Plant Food, supra*, that court realized that the restrictions on contracting by a governing body must be flexi-

ble because of the rapidly changing functions of a government. They refused to require a public auction and decided that the validity of the contract should turn upon the purposes of the contract. If that same analysis is applied to the contract *sub judice* I find that it complies with the requirements that it be fair, reasonable, prompted by the exigencies of the peculiar situation, and advantageous to the municipality. South Charleston's contract was formulated in public, the price is fair, the arrangement for an option is standard business practice where large developments are concerned, and coercion or collusion has not been alleged. To me this is precisely what the court should focus upon in monitoring contracts entered into by the government. If the court sees the hand of Esau but hears the voice of Jacob we should say so; however, we should stop constructing elaborate procedural labyrinths merely because that has traditionally been the way courts achieve their substantive, policy making objectives. Needlessly elaborate procedure is killing America! *Vermont Yankee Nuclear Power, supra.*

While this Court seized upon the supposedly peculiar nature of the option involved here, I fail to perceive why it is so extraordinary. Admittedly, there is a paucity of authority allowing a municipality to agree to an option; however, the slim authority denying an option is a single Alabama case which hardly seems conclusive in this matter. It would be more fruitful to study the cases which present the closest analogy to the option to purchase--the lease of real property by a municipality. The courts have allowed municipal corporations to enter into long term leases of municipal property that extend beyond the terms of the individual members of the governing body. For "to do otherwise would segregate a municipal government from all other corporations and business institutions, in the methods employed for the transaction of business." *City of Biddeford v. Yates*, 104 Me. 506, 72 A. 335 (1908). *See Corning v. Patton*, 236 Ala. 354, 182 So. 39 (1938), *Jonesboro Area Athletic Asso. v. Dickson*, 227 Ga. 513, 181 S.E.2d 852 (1971). It has also

been held in certain instances that a lease would be invalid because it involved property held in a governmental rather than proprietary capacity. Once again, these cases on the whole concern questionable contracts such as a ninety-nine year lease entered into by a county commission on the last day of the term of their office. *Decatur v. DeKalb County*, 130 Ga. 483, 61 S.E. 23 (1908). In sum it appears that the courts (as usual) do almost what they please in this area by attaching the right code words or stock phrases. Courts have always done one thing and said another, but our legal system after 900 years should be entering sufficient maturity that these manipulative exercises which seek to clothe *ad hoc* decisions in the garb of universal principles should no longer be necessary. What I find particularly frightening is the possibility this Court *truly believes* in this instance that they are following the law where there actually is no law. Bad law is usually the result of quick-witted judges working backward from the correct decision on the facts to some principled reason therefor, and of succeeding generations of slow-witted judges who mindlessly take them seriously.

IV

Finally if the city is capable by ordinance of conveying property to the Board of Parks and Recreation without consideration pursuant to *W. Va. Code*, 8-21-9 [1969] then it would also appear that the city can similarly release any restriction in its favor regardless of how such restriction is characterized in terms of land law when the purpose is to permit the Board of Parks and Recreation to sell useless land to acquire money to develop parks for public use. While the statutory scheme does not address this issue directly in such a way as to authorize the city to release restrictions, nonetheless, it does not expressly or impliedly restrict such power either. Thus the issue is for our determination and we should determine it in such a way as to encourage the intelligent use of discretion on the part of our partners in government, local elected officials. I predicate my interpretation of

the sparse statutory scheme exclusively upon our need to help rather than hinder industry.

Judges, whether they be life tenured Federal Court appointees or State judges with eight or twelve year terms are insulated by their government salaries from the vagaries of the private economy. Furthermore, the litigants who seek to enjoin the construction of new business enterprises are often themselves employees of the government or of some other large, organized, collective intelligence such as a corporation which enjoys an oligopolistic position in the product market and these anti-business lobbyists are similarly insulated in their jobs from the vagaries of the competitive sector of the economy. It is, however, the competitive sector of the economy which offers entry level employment to the marginally employable. Employment both in government (except under affirmative action programs) and major industry is sufficiently attractive that all positions can be staffed by the highly qualified; the marginally qualified are left to work in fast food chains, local shopping malls, and on itinerate construction projects. It is hardly an exercise in sublime moral courage for those who are utterly secure in their incomes and jobs to speak in poetic tones about the need for woodlands and recreation while the inarticulate are battered from pillar to post in an effort to find steady work.